UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| MARY JANE BEAUREGARD and JOHN HUGH SMITH,<br><br>Plaintiffs,<br><br>v.<br><br>CLAYTON SAMPSON, et al.,<br><br>Defendants. | Case No. 2:20-cv-02123-KJD-DJA<br><br>**ORDER – Findings of Fact and Conclusions of Law** |

Presently before the Court is the matter of Beauregard v. Sampson. This Court conducted a three-day bench trial on this matter beginning on January 2nd, 2024.

Considering the evidence adduced at trial, the Court makes the following findings and conclusions. Any and all findings of fact set forth herein shall constitute findings of fact even if stated as conclusions of law, and any and all conclusions of law set forth herein constitute conclusions of law even if stated as findings of fact.

Consistent with those findings, the Court hereby rules in favor of Mary Jane Beauregard and John Hugh Smith ("Plaintiffs")[1] on all but one claim, and it adopts Plaintiffs' proposed findings of fact and conclusions of law insofar as they appear below.

**I.   Findings of Fact**

1. In December 2018, Clayton Sampson had several conversations with Matthew "Eddie" Freeman ("Freeman") and Plaintiffs concerning their potential involvement in a new MLM business venture to be called "EnvyTV."

2. On or about December 13, 2018, Clayton Sampson, in a phone call, told Beauregard and Freeman that if they invested $100,000 in the new venture Plaintiffs and Freeman would in exchange each receive a 1% ownership interest in EnvyTV, LLC.

---

[1] Mary Jane Beauregard and John Hugh Smith are and, at all times hereinafter, were husband and wife.

3. Clayton Sampson sent two emails to Plaintiffs and Freeman on December 13, 2018, in which he stated that he is writing to "confirm our agreement as we move forward with EnvyTV."

4. In addition to the 2% ownership interest in EnvyTV, Clayton Sampson represented to Beauregard, Smith, and Freeman that they would receive master Affiliate positions in the EnvyTV Affiliate multilevel hierarchy.

5. Clayton Sampson further promised Plaintiffs and Freeman that their EnvyTV Affiliate positions would be "grandfathered," meaning that Plaintiffs and Freeman did not have to comply with requirements of the EnvyTV Affiliate Compensation Plan.

6. To further induce Plaintiffs to make their investment, Clayton Sampson promised Plaintiffs that they would have the opportunity to participate in the Sampsons' future business endeavors.

7. To further induce Plaintiffs to make their investment, Clayton and Elisha Sampson concealed from Plaintiffs that the Sampsons were struggling financially at the time they were seeking to form EnvyTV.

8. To further induce Plaintiffs to make their investment, Clayton and Elisha Sampson concealed from Plaintiffs that Clayton Sampson planned to file a petition for bankruptcy relief on December 14, 2018.

9. In reliance upon the Sampsons' representations and omissions, on December 14, 2018, Plaintiffs wire transferred $100,000 to Clayton Sampson's bank account.

10. On December 14, 2018, Clayton Sampson filed a petition for bankruptcy relief in California.

11. Clayton and Elisha Sampson did not invest any of their own money into EnvyTV.

12. Plaintiffs would not have invested $100,000 in EnvyTV had they known about Clayton Sampson's intention to file for bankruptcy.

13. Plaintiffs would not have invested $100,000 in EnvyTV had they known that Clayton Sampson did not invest any of his own money into EnvyTV.

14. EnvyTV is a network marketing, or multi-level marketing (MLM) company that sells video streaming services through independent sales representatives called "Affiliates."

15. EnvyTV, LLC is a Nevada limited liability company and Clayton and Elisha Sampson are

co-managers.

16. At all relevant times, Clayton and Elisha Sampson were solely in control of the business and corporate governance of EnvyTV and they had sole possession of EnvyTV's bank accounts and financial records.

17. At the inception of EnvyTV, LLC, Plaintiffs and Freeman were placed at the three master EnvyTV Affiliate positions immediately below the positions held by Clayton Sampson and Elisha Sampson.

18. There were a total of five master Affiliate positions in the EnvyTV Affiliate hierarchy as follows:

   Affiliate Position 100000 Clayton Sampson/EnvyTV

   Affiliate Position 100006 Elisha Sampson

   Affiliate Position 100007 John Smith

   Affiliate Position 100008 Mary Jane Beauregard

   Affiliate Position 100012 Eddie Freeman

19. Because Plaintiffs' EnvyTV Affiliate positions were "grandfathered," these positions were not required to meet sales thresholds or other requirements that apply to other EnvyTV Affiliate positions.

20. Elisha Sampson's Affiliate position was also grandfathered, and she earned commissions despite never enrolling any Affiliates or making any sales of EnvyTV's services.

21. Plaintiffs' EnvyTV Affiliate positions, regardless of whether they were "grandfathered," met the sales thresholds and other requirements set forth in the EnvyTV Affiliate Compensation Plan.

22. Following their placement as EnvyTV Affiliates, Plaintiffs were instrumental in building a substantial Affiliate network from which EnvyTV significantly benefited.

23. Clayton Sampson and Elisha Sampson never presented Plaintiffs with any documentation evidencing their 1% ownership interest in EnvyTV, nor have they shared any profits of EnvyTV with the Plaintiffs.

24. In an email to John Smith in March 2019, Clayton Sampson referred to John Smith as "a

minority owner (1%) in [EnvyTV]."

25. Several months following Plaintiffs' investment in EnvyTV, Clayton Sampson became unhappy with Plaintiffs because he did not like the manner in which they were building their EnvyTV Affiliate positions.

26. Clayton Sampson and Elisha Sampson did not enroll any EnvyTV Affiliates.

27. Clayton Sampson and Elisha Sampson did not sell EnvyTV streaming services to any customers.

28. Without any basis, Clayton Sampson placed Plaintiffs' Affiliate positions on a 30- day suspension in April 2019.

29. The EnvyTV Affiliate Agreement governs the relationship between EnvyTV and its Affiliates. The Affiliate Agreement allows a prevailing party in a dispute to recover attorney's fees.

30. Clayton Sampson did not have any contractual right, under the EnvyTV Affiliate Agreement or otherwise, to make changes to Plaintiffs' Affiliate positions "at any time."

31. Clayton Sampson unilaterally changed the earnings rank for the Affiliate positions held by Plaintiffs based on subjective requirements that were never discussed or agreed to at the time the positions were created.

32. Clayton Sampson manually demoted Plaintiffs' Affiliate positions to a lower earning level (or rank) in the EnvyTV Compensation Plan.

33. Clayton Sampson manually changed the earnings rank for Plaintiffs' EnvyTV Affiliate positions multiple times.

34. On or about February 22, 2020, Plaintiffs stopped receiving Affiliate commission payments from EnvyTV.

35. Plaintiffs did not resign or otherwise terminate their Affiliate positions.

36. Clayton Sampson, acting on behalf of EnvyTV, unilaterally terminated the Plaintiffs' Affiliate positions.

37. The records generated by Multisoft[2] show that the earnings rank for Smith's Affiliate

---

[2] Multisoft is specialized MLM software designed for calculating commissions owed to each distributor. During the trial, records generated by the software were used to determine the commissions received by

- 4 -

position was changed more than forty times between January 2019 and February 2020.

38. The earnings for Plaintiffs' Affiliate positions decreased when the earnings rank for Plaintiffs' Affiliate positions was demoted or decreased.

39. Clayton Sampson's unilateral changes to the earnings rank (or level) of the Plaintiffs' EnvyTV Affiliate positions impacted the amount of commissions paid to the Plaintiffs.

40. The earnings for Clayton and Elisha Sampson's Affiliate positions increased when the earnings rank for Plaintiffs' Affiliate positions were demoted or decreased.

41. The commissions that were previously paid to Plaintiffs' Affiliate positions (Affiliate Positions 100007 and 100008), were paid to the positions held by Elisha Sampson (Affiliate Position 100006) and Clayton Sampson/EnvyTV (Affiliate Position 100000) after Plaintiffs' positions were deactivated.

42. Clayton Sampson unilaterally and arbitrary terminated Plaintiffs' EnvyTV affiliate positions.

43. The EnvyTV Affiliate Agreement requires written notice to Affiliates of any disciplinary action, suspension, or termination.

44. Plaintiffs did not receive any notice or communication from Clayton Sampson or Elisha Sampson or EnvyTV informing them that their Affiliate positions were being involuntarily terminated.

45. Plaintiffs' Affiliate hierarchy continued to grow following the termination of Plaintiffs' Affiliate positions.

46. Commissions continued to be generated by Plaintiffs' EnvyTV Affiliate positions following the termination of Plaintiffs as EnvyTV Affiliates.

47. Clayton Sampson and Elisha Sampson have never shared EnvyTV profits with the Plaintiffs.

48. Clayton Sampson and Elisha Sampson have launched various other Envy-related business ventures, including EnvySolutions, EnvyCares, EnvyConnect, EnvySocial, and an online Envy crypto currency business.

49. EnvySolutions and EnvyCares sell products and services through Affiliates similar to EnvyTV.

---

Plaintiffs.

50. The EnvySolutions Affiliate compensation plan is substantially similar to EnvyTV's Affiliate compensation plan.
51. The video streaming service previously operated as EnvyTV is now operated by the Sampsons as "TCC Media Player."
52. Clayton Sampson and Elisha Sampson never gave Plaintiffs an opportunity to participate in their other Envy-related business ventures as promised.
53. Clayton Sampson and Elisha Sampson have generated profits and revenues through the other Envy-related business ventures since January 1, 2019.
54. Clayton Sampson and Elisha Sampson have not produced documents showing their earnings generated from their other Envy-related business ventures.
55. Subsequent to forming EnvyTV, Clayton Sampson published one or more posts on social media claiming to have millions of dollars from his Envy-related companies.
56. Subsequent to forming EnvyTV, Clayton Sampson published a post on social media claiming to be a billionaire.
57. Clayton Sampson and Elisha Sampson have never shared with Plaintiffs any profits generated from their other Envy-related business ventures.
58. Plaintiffs expected to share in the profits of EnvyTV, LLC and the Sampson's other business ventures when they invested $100,000.
59. Despite claiming that Plaintiffs never acquired an ownership interest in EnvyTV, Defendants have not returned to Plaintiffs their $100,000 investment in EnvyTV.
60. Eddie Freeman assigned to Plaintiffs all of his claims related to his 1% interest in EnvyTV, LLC.
61. Plaintiffs have suffered lost EnvyTV Affiliate commissions based upon Clayton Sampson's unilateral demotions of Plaintiffs' Affiliate rank.
62. Between the date Plaintiffs' Affiliate positions were terminated (February 2020) through July 10, 2021, Beauregard and Smith's former EnvyTV Affiliate positions generated commissions of $50,692 and $51,340, respectively. At this earnings level, the two positions would have earned a combined total of $121,380 in commissions ("Past Commissions") from the date of

termination (February 2020) through October 11, 2021.

63. The income stream from a multi-level marketing position can last over a period of years. It is not uncommon for a MLM position to generate earnings for more than ten (10) years.

64. Plaintiffs have estimated the future earnings of their EnvyTV Affiliate positions over a seven-year period from October 12, 2021, forward at the same earnings level used in calculating their Past Commissions (i.e., assuming no growth). Using a discount rate of nine percent (9%), the present value of the commissions generated from Plaintiffs' EnvyTV Affiliate positions over a seven-year period is $389,132 ("Future Commissions").

65. Because the Sampsons' terminated Eddie Freeman's Affiliate Position, Plaintiffs' Future Commissions would likely be more than $389,132 because commissions generated by Freeman's Affiliate position would have rolled-up to Plaintiffs' Affiliate positions. If commissions from Freeman's Affiliate position are included, the present value of Plaintiffs' Future Commissions would be $452,000.

66. Plaintiffs have suffered damages related to their percentage of ownership or lost opportunity to participate in the Sampsons' other business ventures. Defendants have not produced documents that show the profits generated from their other business ventures.

67. Plaintiffs have incurred attorney's fees in prosecuting their claims.

68. Plaintiffs have incurred court costs and expenses in prosecuting this lawsuit.

## II.     Conclusions of Law

1. The court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the parties are completely diverse and the amount in controversy exceeds $75,000 exclusive of interest and costs.

### a.     Breach of Contract

1. Plaintiffs seek to hold Defendant EnvyTV liable for breach of contract on two separate contracts.

2. Under Nevada law, the plaintiff in a breach of contract action must show (1) the existence of a valid contract, (2) a breach by the defendant, and (3) damage as a result of the breach. Rivera v. Peri & Sons Farms, Inc., 735 F.3d 892, 899 (9th Cir. 2013).

3. First, the Court concludes that a valid and enforceable contract (hereinafter "email contract") was formed, between Plaintiffs and EnvyTV, when Plaintiffs wire transferred $100,000 to Clayton Sampson's bank account, based on Defendant Clayton Sampson's December 13, 2018, email.

4. Second, the Court concludes that the Affiliate Agreement, between Plaintiff John Smith and EnvyTV, is a valid and enforceable contract.[3]

5. Both contracts are enforceable as written under Nevada law and must be interpreted and applied according to their plain and unambiguous terms. See <u>Ellison v. California State Auto. Ass'n</u>, 797 P.2d 975, 977 (Nev. 1990).

6. The terms of the email contract make clear that Plaintiffs Mary Jane Beauregard and Eddie Freeman would each receive a 1% ownership interest in EnvyTV for a total of $100,000, John Smith would receive a 5th level Affiliate position in EnvyTV, Eddie Freeman would receive a 4th level Affiliate position in EnvyTV, and Ditto would receive a 6th level affiliate position in EnvyTV.[4]

7. The Court concludes that Defendant EnvyTV breached the terms of the email contract when it terminated Plaintiffs' Affiliate positions in February 2020 without notice.

8. As Plaintiffs' $100,000 investment was never returned to them, the Court concludes that Plaintiffs suffered monetary damages as a result of EnvyTV's breach.

9. The terms of the Affiliate Agreement clearly state that when the decision is made to terminate an affiliate, EnvyTV will inform the affiliate, in writing, of their termination.[5]

---

[3] At trial, it was never fully established whether Plaintiff Mary Jane Beauregard signed an Affiliate Agreement; however, based on Defendant Clayton Sampson's assertions at trial, everyone in EnvyTV must have an Affiliate Agreement to be paid. In addition, Clayton Sampson repeatedly tried to contradict the terms of the email contract by introducing terms from the Affiliate Agreement. The Court infers this as Clayton Sampson's belief that the Affiliate Agreement is binding on Plaintiff Mary Jane Beauregard.

[4] During trial, there was confusion surrounding who owned Ditto's 6th level affiliate position. John Smith believed it was owned by himself and Eddie Freeman. However, by the end of trial it was uncontested that Mary Jane Beauregard was receiving commissions from the position.

[5] At trial, the Affiliate Agreement was offered into evidence, with neither party contesting the document's authenticity. However, the quality of the exhibit makes it impossible to read the last part of the sentence relating to notice of termination. The exact language is as follows: "When the decision is made to terminate Affiliate, Company will inform the Affiliate in writing at the address in the Affiliate's file that the (unreadable)." Based on trial testimony, the Court believes the unreadable language to be "termination has occurred."

10. At trial, Defendant Clayton Sampson admitted to failing to inform Plaintiffs that their Affiliate positions were terminated.
11. The Court concludes that Defendant EnvyTV breached the terms of the Affiliate Agreement when it terminated Plaintiffs' Affiliate positions in February 2020 without notice.
12. As Plaintiffs stopped receiving commissions after their positions were terminated without notice, the Court finds that Plaintiffs suffered monetary damages as a result of Defendant EnvyTV's breach.
13. The Court finds that judgment is appropriate for Plaintiffs, against Defendant EnvyTV, on their breach of contract claim.

      b. <u>Fraudulent Misrepresentation</u>

1. Under Nevada Law, Plaintiffs have the burden of proving each and every element of their fraudulent misrepresentation claim by clear and convincing evidence: (1) a false representation made by Defendants; (2) Defendants' knowledge or belief that its representation was false or that Defendants have an insufficient basis of information for making the representation; (3) Defendants intended to induce Plaintiffs to act or refrain from acting upon the misrepresentation; and (4) damage to Plaintiffs as a result of relying on the misrepresentation. <u>Barmettler v. Reno Air, Inc.</u>, 956 P.2d 1382, 1386 (Nev. 1998).
2. The evidence shows that Defendant Clayton Sampson made one or more false representations to Plaintiffs with the knowledge and belief that the representation was false. Specifically, although Plaintiffs were told that they would receive a 5th and 6th level Affiliate position in EnvyTV, Defendant Clayton Sampson was under the belief that he could unilaterally change the earnings rank for these positions at any time.
3. Defendant Clayton Sampson's representation was made as part of a contract between Defendant EnvyTV and Plaintiffs. Thus, the Court concludes that the representation was made with the intent to induce Plaintiffs to pay Defendants $100,000.
4. Because Defendant Clayton Sampson unilaterally terminated Plaintiffs' EnvyTV Affiliate position without notice and never returned their $100,000 investment, the Court concludes that Plaintiffs suffered monetary damages as a result of relying on Defendant Clayton

1    Sampson's misrepresentation.

2  5. The Court finds that judgment is appropriate for Plaintiffs, against Defendant Clayton Sampson, on their fraudulent misrepresentation claim.

      c. <u>Fraud by Non-Disclosure (NRS 90.570)</u>

1. Pursuant to Section 90.570(2) of the Nevada Revised Statutes, in connection with the offer to sell, sale, offer to purchase or purchase of a security, a person shall not, directly or indirectly, make an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made not misleading in the light of the circumstances under which they are made. <u>Hable v. Godenzi</u>, No. 2:22-CV-02012-GMN-BNW, 2023 WL 8653185, at *8 (D. Nev. Dec. 12, 2023); Nev. Rev. Stat. § 90.570.

2. As defined in Section 90.295 of the Nevada Revised Statutes, a "security" can mean participation in a profit-sharing agreement, a limited partnership interest, an interest in a limited-liability company, or investment contract. Nev. Rev. Stat. § 90.295.

3. The Court finds that the contract between the parties falls within the statutory definition of a "security." <u>See</u> Nev. Rev. Stat. § 90.295.

4. The Court finds that Defendant Clayton Sampson directly omitted to Plaintiffs the material fact that he could change the earnings rank for their positions at any time. By omitting this fact, Defendant Clayton Sampson made the terms of the contract misleading in light of the circumstances under which they were made—that Plaintiffs would receive 5th and 6th level Affiliate positions in EnvyTV.

5. The Court finds that judgment is appropriate for Plaintiffs, against Defendant Clayton Sampson, on their NRS 90.570 (fraud by non-disclosure) claim.

      d. <u>Breach of Fiduciary Duty and Conspiracy</u>

1. Plaintiffs seek to hold Defendants liable for breach of fiduciary duty and conspiracy.

2. A claim for breach of fiduciary duty customarily has three elements: (1) existence of a fiduciary duty, (2) breach of the duty, and (3) damages as a result of the breach. <u>Guzman v. Johnson</u>, 483 P.3d 531, 538 (Nev. 2021).

3. It is generally recognized that joint venturers owe to one another fiduciary duties. <u>Leavitt v.

Leisure Sports Incorporation, 734 P.2d 1221, 1224 (Nev. 1987).

4. A joint venture is a contractual relationship in the nature of an informal partnership wherein two or more persons conduct some business enterprise, agreeing to share jointly, or in proportion to capital contributed, in profits and losses. Radaker v. Scott, 855 P.2d 1037, 1040 (Nev. 1993).

5. Although the terms of the email contract make clear that Plaintiffs would receive an ownership share in EnvyTV, the contract is silent as to whether Plaintiffs would jointly share in any losses EnvyTV accrued; and the Affiliate Agreement is also silent as to whether Plaintiffs agreed to share in any losses. Furthermore, no evidence was produced at trial that Plaintiffs did in fact agree to share in any losses.

6. The Court concludes that because no joint venture existed, Defendants owed no fiduciary duties to Plaintiffs.

7. In Nevada, an actionable civil conspiracy consists of a combination of two or more persons who, by some concerted action, intend to accomplish an unlawful objective for the purpose of harming another, and damage results from the act or acts. Consol. Generator-Nevada, Inc. v. Cummins Engine Co., 971 P.2d 1251, 1256 (Nev. 1998) (quotations omitted). Direct evidence is not required to establish a conspiracy, but circumstantial evidence may be relied upon. Sheriff, Humboldt Cnty. v. Lang, 763 P.2d 56, 59 (Nev. 1988) (quotations omitted).

8. At trial, Plaintiffs failed to offer any evidence that Defendants Clayton and Elisha Sampson acted in concert with one another with the intent to defraud Plaintiffs. Although Defendants were co-managers of EnvyTV, the facts adduced at trial show that Elisha Sampson was mostly unaware of Clayton Sampson's business activities. Clayton Sampson testified that all company decisions are made by him and that only he can terminate or demote an Affiliate position. As the record stands, Plaintiffs have no evidence to support their claim of conspiracy.

9. The Court finds that judgment is appropriate for Defendants on Plaintiffs' breach of fiduciary duty and conspiracy claim.

      e.   <u>Suit Against Control Persons and Aider Under Nevada Securities Act (NRS 90.660(4))</u>

1. Pursuant to NRS 90.660(4), Plaintiffs seek to hold Defendant Elisha Sampson jointly and severally liable for Defendant Clayton Sampson's securities fraud.
2. Under Section 90.660(4) of the Nevada Revised Statutes, a person who directly or indirectly controls another person who is liable under NRS 90.570, a partner, officer or director of the person liable, a person occupying a similar status or performing similar functions, any agent of the person liable, an employee of the person liable if the employee materially aids in the act, omission or transaction constituting the violation . . . are also liable jointly and severally with and to the same extent as the other person, but it is a defense that the person did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by which the liability is alleged to exist. Nev. Rev. Stat. § 90.660(4).
3. Evidence produced at trial fully established that Clayton Sampson and Elisha Sampson are the co-owners and co-managers of EnvyTV.
4. As Clayton Sampson is individually liable for securities fraud under NRS 90.570, Elisha Sampson, being a person occupying a similar status as Clayton Sampson—a co-owner and co-manager of EnvyTV—is also liable for securities fraud. <u>See</u> Nev. Rev. Stat. § 90.660(4).
5. The Court finds that judgment is appropriate for Plaintiffs, against Defendant Elisha Sampson, on their NRS 90.570 (fraud by non-disclosure) claim.

      f.   <u>Recission Under Nevada Uniform Securities Act (NRS 90.660(1)(d))</u>

1. Plaintiffs seek statutory rescission of the email contract.
2. Rescission is an equitable remedy which totally abrogates a contract and which seeks to place the parties in the position they occupied prior to executing the contract. <u>Bergstrom v. Est. of DeVoe</u>, 854 P.2d 860, 861 (Nev. 1993).
3. The purpose of this is to prevent harm to the defendant; the defendant should not by rescission sacrifice the benefits of the agreement and at the same time not be restored the benefits he previously conferred upon the plaintiff. <u>Id.</u>
4. The Court finds that, while rescission is a valid form of relief, it would not fully compensate

Plaintiffs for their monetary damages. Therefore, the Court determines that rescission is not warranted under the facts presented.

### g. Piercing the Corporate Veil/Alter Ego

1. Plaintiffs seek to hold Defendants Elisha and Clayton Sampson liable for the acts of Defendant EnvyTV.

2. In Nevada, the elements for finding an alter ego are: (1) the corporation must be influenced and governed by the person asserted to be the alter ego; (2) there must be such unity of interest and ownership that one is inseparable from the other; (3) the facts must be such that adherence to the corporate fiction of a separate entity would, under the circumstances, sanction a fraud or promote injustice. LFC Mktg. Grp., Inc. v. Loomis, 8 P.3d 841, 846-47 (Nev. 2000).

3. As Defendant Clayton Sampson testified that all company actions are made by him, it is undisputed that he influences and governs EnvyTV. Although not to the same degree as Defendant Clayton Sampson, Elisha Sampson also influences and governs EnvyTV. Elisha Sampson is EnvyTV's bookkeeper and manages the company's finances and bank accounts.

4. At trial, Plaintiffs produced the 2019 K-1s for Clayton Sampson and Elisha Sampson, conclusively proving that they own a portion of EnvyTV. Furthermore, Clayton Sampson and Elisha Sampson both testified that they are owners of EnvyTV. Defendants' ownership of corporate shares is a strong factor favoring unity of ownership and interest. See id. at 847.

5. Here, Defendants completely abused the corporate form by using corporate funds for their individual obligations. Money from EnvyTV was used to make payments on Defendants' car loans and home mortgage, cover expenses such as dry cleaning and food, and purchase a boat. Adhering to the corporate fiction of EnvyTV as a separate legal entity would promote injustice.[6]

6. The Court concludes that EnvyTV is the alter ego of Defendants Clayton Sampson and Elisha Sampson, and therefore, are jointly and severally liable for the acts of Defendant EnvyTV. Specifically, Defendant EnvyTV's breach of contract.

---

[6] The corporate bank records of the income and expenditures are in evidence; however, Plaintiffs have not provided the Court with a summary total of corporate funds used for personal expenses.

      h. <u>Breach of Implied Covenant of Good Faith and Fair Dealing</u>

1. Plaintiffs seek to hold Defendants liable for breaching the implied covenant of good faith and fair dealing.

2. An implied covenant of good faith and fair dealing is recognized in every contract under Nevada law. <u>Pemberton v. Farmers Ins. Exchange</u>, 858 P.2d 380, 382 (Nev. 1993). Where the terms of a contract are literally complied with but one party to the contract deliberately countervenes the intention and spirit of the contract, that party can incur liability for breach of the implied covenant of good faith and fair dealing. <u>Hilton Hotels Corp. v. Butch Lewis Prods., Inc.</u>, 808 P.2d 919, 922–23 (Nev. 1991).

3. As stated previously, Defendant EnvyTV breached the terms of the email contract and Affiliate Agreement when it terminated Plaintiffs' Affiliate positions in February 2020 without notice.

4. The Court finds that Defendant EnvyTV's actions constitute a breach of the implied covenant of good faith and fair dealing. Furthermore, as Defendant EnvyTV is the alter ego of Defendants Clayton and Elisha Sampson, they are also liable for breaching the implied covenant of good faith and fair dealing.

5. The Court finds that judgment is appropriate for Plaintiffs, against Defendants, on their breach of implied covenant of good faith and fair dealing claim.

      i. <u>Exemplary Damages (NRS 42.005)</u>

1. Plaintiffs seek to recover punitive damages from Defendants Clayton and Elisha Sampson pursuant to NRS 42.005.

2. Except as otherwise provided in NRS 42.007, in an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud or malice, express or implied, the plaintiff, in addition to the compensatory damages, may recover damages for the sake of example and by way of punishing the defendant. Nev. Rev. Stat. § 42.005(1).

3. As Defendant Clayton Sampson is guilty of common law and securities fraud, the Court finds that punitive damages are appropriate.

4. As Defendant Elisha Sampson is guilty of securities fraud, the Court finds that punitive damages are appropriate.

   j. <u>Attorney's Fees</u>

1. Plaintiffs seek to recover their attorney's fees incurred in prosecuting their claims.
2. Pursuant to NRS 90.660(1)(d), reasonable attorney's fees and costs may be recovered against an individual found guilty of violating NRS 90.570. <u>See</u> Nev. Rev. Stat. § 90.660(1)(d).
3. In a lawsuit where the plaintiff presents different claims for relief that involve a common core of facts or are based on related legal theories, the district court should not attempt to divide the request for attorney's fees on a claim-by-claim basis. <u>Ambat v. City & Cnty. of San Francisco</u>, 757 F.3d 1017, 1032 (9th Cir. 2014) (simplified). Instead, the court must focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation. <u>Id.</u>
4. The Court finds that Plaintiffs are entitled to reasonable attorney's fees and costs because their claims share a common core of facts, and they achieved overall success at trial.

   k. <u>Request for Accounting and Constructive Trust</u>

1. Plaintiffs request a full accounting of EnvyTV and EnvySolutions, as well as a constructive trust be imposed. Currently, the Court finds that imposing a constructive trust, without a full accounting, is premature.
2. An equitable accounting is essentially a legal action or equitable remedy, designed to compel a defendant to account for and pay over money owed to the plaintiff but held by the defendant. <u>Muney v. Arnould</u>, 524 P.3d 491 (Nev. 2023) (unpublished disposition) (simplified).
3. A necessary prerequisite to the right to maintain a suit for an equitable accounting, like all other equitable remedies is the absence of an adequate remedy at law. <u>Barnes v. Kris Henry, Inc.</u>, No. 20-17141, 2022 WL 501582, at *1 (9th Cir. Feb. 18, 2022) (quotations omitted).
4. The Court finds that Defendants have insufficiently produced evidence that allows the Court to determine the current value of Plaintiffs' 2% ownership in EnvyTV. Without this information, the Court cannot accurately determine the appropriate amount of compensatory

damages.

5. The Court concludes that a comprehensive accounting of Defendants' accounts and records related to EnvyTV is needed.

6. As previously stated, the email contract makes clear that Plaintiffs would have the opportunity to participate in Defendants' other Envy-related businesses. However, Defendants have not produced any documents showing the earnings generated from their other Envy-related business ventures. Without this information, the Court cannot accurately determine the appropriate amount of compensatory damages.

7. The Court concludes that a comprehensive accounting of Defendants' various other Envy-related business ventures, including EnvySolutions, EnvyCares, EnvyConnect, EnvySocial, and an online Envy crypto currency business, is needed.

### III.     Damages

1. The Court finds that, under the email contract, Defendants are entitled to keep Plaintiffs' $100,000 investment in EnvyTV.

2. The Court finds that Plaintiffs are entitled to $121,380 in compensatory damages, with interest, for their breach of contract claim, arising from unpaid Affiliate earnings from February 2, 2020, through October 11, 2021.

3. The Court finds that Plaintiffs are entitled to $353,000 in compensatory damages, with interest, for their breach of contract claim, arising from unpaid Affiliate earnings from October 12, 2021, through October 11, 2028.

4. The Court finds that the question of prejudgment interest is not easily determined and requires additional briefing. The Court finds that NRS 17.130 may not be the governing statute for determining prejudgment interest, but rather NRS 99.040 is. See Wilson v. Pac. Maxon, Inc., 714 P.2d 1001, 1002 (Nev. 1986). Moreover, the Court believes that different interest rates may be applicable for assessing prejudgment interest under NRS 99.040, based on when commissions were due. See Nev. Rev. Stat. § 99.040(1).

5.  The Court finds that Plaintiffs are entitled to punitive damages. However, the Court will determine the amount to be awarded once Defendants undertake a full accounting.

6. The Court finds that Plaintiffs are entitled to reasonable attorney's fees and costs. However, the Court requires additional briefing before awarding them.

7. The Court finds that Plaintiffs are entitled to recuperate $8,175 in arbitration expenses and $8,500 for discovery abuse, as awarded by Magistrate Judge Albregts.

### IV.     Conclusion

Accordingly, **IT IS HEREBY ORDERED** that, consistent with these findings and conclusions, judgment shall be entered in favor of Plaintiffs, against Defendants, on their breach of contract claim.

**IT IS FURTHER ORDERED** that, consistent with these findings and conclusions, judgment shall be entered in favor of Plaintiffs, against Defendant Clayton Sampson, on their common law fraud claim.

**IT IS FURTHER ORDERED** that, consistent with these findings and conclusions, judgment shall be entered in favor of Plaintiffs, against Defendants Clayton and Elisha Sampson, on their securities fraud (NRS 90.570) claim.

**IT IS FURTHER ORDERED** that, consistent with these findings and conclusions, judgment shall be entered in favor of Defendants, on Plaintiffs' breach of fiduciary duty and conspiracy claim.

**IT IS FURTHER ORDERED** that, consistent with these findings and conclusions, judgment shall be entered in favor of Plaintiffs, against Defendants, on their breach of implied covenant of good faith and fair dealing claim.

**IT IS FURTHER OREDERED** that within fourteen (14) days from the date of this order, Plaintiffs shall file a new damages summary. The motion should adequately address the question of prejudgment interest. Defendants will then have seven days to respond, and Plaintiffs will have seven days to file a reply.

**IT IS FURTHER ORDERED** that within fourteen (14) days from the date of this order, Plaintiffs shall file a motion for attorney's fees and costs. The motion should contain a detailed breakdown of the hours spent on the litigation and the price billed per hour. Defendants will then have seven days to respond, and Plaintiffs will have seven days to file a reply.

**IT IS FURTHER ORDERED** that within thirty (30) days from the date of this order, Defendants shall produce a full accounting of all corporate and personal financial records related to EnvyTV, EnvySolutions, EnvyCares, EnvyConnect, EnvySocial, and EnvyCrypto. Failure to comply with the Court's order will result in enhanced punitive damages.

**FINALLY**, the Court will issue a damages judgment once it has received all requested briefings and information.

Dated this 31st day of January 2024.

_____
Kent J. Dawson
United States District Judge